PORTIS *v.* BOARD OF PUBLIC UTILITIES, LEPANTO.
LEPANTO *v.* GOLDSBY.

4-8438                                                    209 S. W. 2d 864

Opinion delivered April 5, 1948.

202

*John S. Mosby,* for appellee.

*Willis Townsend, amicus curiae.*

HOLT, J. Lepanto, Arkansas, is an incorporated town, owning its water and sewer systems (originally constructed by improvement districts), which are now free of all debts.

Proceeding under Act 95 of the Acts of the Legislature of 1939, a Board of Public Utilities was created and at all times since its creation, has had the sole and exclusive control of the maintenance, enlargement and operation of the water and sewer systems of Lepanto. Finding it necessary to enlarge and extend the two systems, proceedings were begun by the Board of Public Utilities (hereinafter called the Board) to use $2,532.45 of revenues in its hands, and by resolution, said Board sought to issue revenue bonds in the amount of $80,000 to make these improvements.

At the same time proceedings were instituted, before the Town Council of Lepanto (hereinafter called the Town), and an ordinance was enacted to accomplish the same purpose as that undertaken by the Board.

For the purpose of determining whether the authority to issue the proposed bonds was vested in the Board or in the Town, T. B. Goldsby, a property owner, filed suit against the Town and its officers, and D. F. Portis, another property owner, filed a separate suit against the Board. In each of said suits it was sought to enjoin the issuance of the bonds.

Goldsby, in his complaint, alleged, in effect, that the power to issue the bonds rested with the Board of Utilities and not with the Town. The Town's answer was, in effect, a denial that it did not have the authority to issue the bonds. A demurrer to this answer was sustained. The Town elected to stand on its answer, whereupon the court entered its decree granting the injunctive relief prayed and the Town has appealed.

Portis' action was against the Board of Public Utilities of Lepanto, Arkansas, and he alleged, in substance, that the power to issue the revenue bonds in question rested with the Town of Lepanto and not with the Board. The Board answered and in effect denied that it did not have the authority to issue the bonds. A demurrer to this answer was filed and overruled, whereupon the plaintiff, Portis, elected to stand upon his demurrer, refused to plead further, the court dismissed his complaint for want of equity and he has appealed.

The causes were consolidated by the trial court.

On this appeal, the question presented is whether the Board of Public Utilities of the incorporated town of Lepanto, Arkansas, or the Town Council of Lepanto had the right to issue revenue bonds, secured by a pledge of future revenues to pay for certain improvements and extensions to the water and sewer systems of said incorporated town, both of which are now operated by the Board of Public Utilities, and free of debt.

We have reached the conclusion, for the reasons presently to be pointed out, that the sole authority to issue the revenue bonds, here in question, rested with the incorporated town of Lepanto and not with the Board of Utilities.

It is undisputed that until the enactment of Act 95 of 1939, the power to issue these revenue bonds was in the Town under Acts 131 and 132 of 1933, and unless this authority has been taken away from the Town and given to the Board, by Act 95, then the power to issue the bonds must, and does, remain in the Town.

Among the provisions of Act 95 are the following: Section 1 provides that the Board of Public Utilities " . . . have the sole and exclusive control of the maintenance, enlargement and operations of such plants, subject to the following provisions and conditions; provided this Act shall not apply to such Districts that have outstanding bonds unpaid."

"Section 4. Said Board of Public Utilities may, in their discretion, from time to time, make such enlargement or enlargements of said plants and systems and such extensions of the lines thereof as may be necessary to serve the residents of said city or town with electric lights, electric power, water or sewerage, whether the area to be so serviced shall be included in any such improvement district or not; provided, that no additional tax shall be levied upon the property within such improvement district or districts, but the funds for such purpose may be contributed in whole or in part by outside agencies, or by the persons to be benefited, or in the discretion of the Board, may be taken from the net revenue coming into its hands."

"Section 25. Said Board of Public Utilities shall have the right to fix the rates to be charged for the service to be rendered by any and all plants or sewerage systems under its jurisdiction and may do and perform all things necessary to enforce the collection of the same and shall do any and all things necessary to the successful operation and maintenance of said electric light plants, water plants or sewerage systems."

"Section 28. Any profits derived by any of the Boards of Public Utilities created under this Act, after there has been set aside from the earnings a sum sufficient to pay all outstanding indebtedness of the plants or sewerage systems under the control of said Board and

a sum sufficient to provide for expenses, extensions and enlargements found necessary, or which may be reasonably anticipated, shall be used by said Board to retire any outstanding Bonds or interest thereon issued by any of the Boards of Improvement of the Districts constructing the plants under its control. And in case there are no such outstanding bonds or interest or when all of such outstanding Bonds and interest thereon shall have been paid such profits shall be paid to the Treasurer of the City or Town wherein such Board is created to be by the Board of Aldermen of said City or Town used to defray any expense or pay any debt of said City or Town.''

We have found no provision whatever in Act 95, which by express words, by implication, or otherwise, gives to the Board the authority which it claims, to issue these bonds. Had the Legislature desired, or intended, that the Board should have such power, it would have been an easy matter to have expressly so provided in the Act, and this it did not do.

The general rule is well established that municipal corporations, or their officers, departments or subdivisions are creatures of the statute and possess and can exercise only such powers as are granted in express words by such statute, or those necessarily or fairly implied, or incident to the powers expressly conferred, or those powers which are essential or indispensable to the accomplishment of the declared purposes of the corporation.

In *Bain* v. *Fort Smith Light & Traction Company*, 116 Ark. 125, 172 S. W. 843, L. R. A. 1915D, 1021, this court said: ''A municipal corporation has no powers except those expressly conferred and those fairly implied for the attainment of declared purposes,'' and in *Cumnock* v. *City of Little Rock*, 154 Ark. 471, 243 S. W. 57, this court said: ''In *Ottawa* v. *Carey*, 108 U. S. 110, 2 S. Ct. 366, 27 L. Ed. 669, the Supreme Court of the United States, speaking through Chief Justice WAITE said: 'Municipal corporations are created to aid the State Government in the regulation and administration of local affairs. They have only such powers of government as are

expressly granted them, or such as are necessary to carry into effect those that are granted. No powers can be implied except such as are essential to the objects and purposes of the corporation as created and established. 1 Dill. on Mun. Corp., 3 Ed., par. 89, and cases there cited. To the extent of their authority they can bind the people and the property subject to their regulation and governmental control by what they do, but beyond their corporate powers their acts are of no effect.

"On the same point in Dillon on Municipal Corporations, 5th Ed. vol. 1, par. 237 (89), it is said: 'It is a general and undisputed proposition of law that a municipal corporation possesses and can exercise the following powers, and no others: First, those granted in express words; second, those necessarily or fairly implied in or incident to the powers expressly granted; third, those essential to the accomplishment of the declared objects and purposes of the corporation, not simply convenient, but indispensable. Any fair, reasonable, substantial doubt concerning the existence of power is resolved by the courts against the corporation, and the power is denied.'

"The principle laid down above is one of universal application throughout the United States and has been recognized and applied by this court in several cases according to the particular facts of each case." See, also, *Bennett* v. *City of Hope,* 204 Ark. 147, 161 S. W. 2d 186.

In *Detroit Citizens' St. Ry. Co.* v. *Detroit Ry.,* 171 U. S. 48, 18 S. Ct. 732, at p. 734, 43 L. Ed. 67, the Supreme Court of the United States announced the rule in this language: "The power, therefore, must be granted in express words or necessarily to be implied. . . . Municipal corporations possess and can exercise only such powers as are 'granted in express words, or those necessarily or fairly implied, in or incident to the powers expressly conferred, or those essential to the declared objects and purposes of the corporation, not simply convenient, but indispensable.' . . . This would make 'necessarily implied' mean inevitably implied. The Court of Appeals of the Sixth Circuit, by Circuit Judge Lurton,

adopts Lord Hardwicke's explanation, quoted by Lord Eldon in *Wilkinson* v. *Adam,* 1 Ves. & B. 422, 466, that 'a necessary implication means not natural necessity, but so strong a probability of intention, that an intention contrary to that, which is imputed to the testator, cannot be supposed.' "

In the circumstances here, it cannot be logically or successfully contended that the power of the Board to issue the bonds was a necessary or indispensable one for the reason that the Town had ample power to issue the bonds under Acts 131 and 132 of 1933, *supra,* and as indicated, this power was not taken away from the Town by Act 95.

Of strong significance is the fact that the Legislature refused to grant to the Board the right to use the profits of these plants for the security of future bond issues, but specifically directed (§ 28, *supra,*) that such profits should be paid to the Treasurer of the City or Town, wherein such Board is created, to be "used to defray any expense or pay any debt of said City or Town."

Clearly we think it was the intention of the Legislature under Act 95 that Cities or Towns should still have the sole right to issue bonds under Acts 131 and 132 of 1933, *supra,* and realizing that municipalities would need the revenues from these plants to secure any bonds that might be issued by the municipalities, themselves, and for other purposes, the Legislature intended that the sole power to issue such revenue bonds should rest with the municipality.

Of much significance also is the following provision in § 29, *supra,* which specifically denies to the Board the right to mortgage or create a lien upon the plants under its control. "No Board of Public Utilities created under the terms of this Act shall ever have the right to sell, mortgage, or create any lien whatsoever upon any of the plants under its jurisdiction, etc."

It must also be noted that no additional tax could be levied upon the property within the improvement district to pay for any enlargements or extensions. Section 4, *supra,* so provides. Thus clearly it appears from

the provisions of § 4 that three methods were provided for funds by which the Board might pay for any enlargements or extensions of the two systems under its control. First, such "funds . . . may be contributed in whole or in part by outside agencies," such as federal grants, gifts, or aid from the municipality from funds on hand or from a revenue bond issue. Second, by contributions from "persons to be benefited." By this the clear intention seems to be, while no tax could be levied to make the improvements, yet if the property owners, desiring them, desired to pay the costs themselves, the Board was empowered to accept such contributions for the purpose of making the improvements, and third, the Board in its discretion, may take funds "from the net revenue coming into its hands" to make the improvements.

In short, we hold that Act 95, *supra,* did not confer upon the Board of Utilities here the power to issue revenue bonds; that, being a creature of the statute, the Board had only such powers as were expressly, or impliedly given to it by the Legislature, and that it was the clear intent of the lawmakers that only one municipal authority, the municipality itself, should have the power to issue these revenue bonds.

Since, however, § 1 of Act 95 specifically provides that the Board was "to have the sole and exclusive control of the maintenance, enlargement and operations of such plants," the water and sewer systems, it would be appropriate for the Board, when it has determined that it would be to the interest of the Town to enlarge or extend these systems, which improvements it is unable to make out of the revenues in its hands, to make this fact known to the Council of the Town of Lepanto with its (Board's) recommendation and request that the Town take the necessary steps to issue and sell revenue bonds to secure the funds for the Board to enable it to make the proposed improvements.

Accordingly, the decree is reversed with directions to proceed in a manner not inconsistent with this opinion.

See 212 Ark. 822, 208 S. W. 2d 772.